IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

BASIL AL-ASBAHI,

        Plaintiff,

v.                                    CIVIL ACTION NO. 1:15CV144
                                          (Judge Keeley)

THE WEST VIRGINIA UNIVERSITY BOARD
OF GOVERNORS, THE WEST VIRGINIA
UNIVERSITY SCHOOL OF PHARMACY, DR.
ELIZABETH SCHARMAN, DR. TERRENCE L.
SCHWINGHAMMER, DR. JAY L. MARTELLO,
DR. PATRICIA CHASE, DR. LENA MAYNOR,
DR. MARY EULER, DR. CHRISTOPHER C.
COLENDA, and DR. CHADRICK LOWTHER, in
their official and individual capacities,

        Defendants.

MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]

    Pending for consideration is the motion for summary judgment
(dkt. no. 49) filed collectively by the defendants. Also pending is
the motion for partial summary judgment (dkt. no. 52) filed by the
plaintiff, Basil Al-Asbahi ("Al-Asbahi"). For the reasons that
follow, the Court **GRANTS** the defendants' motion and **DENIES** Al-
Asbahi's motion.

### 1. FACTUAL BACKGROUND[1]

    Al-Asbahi is Syrian of Arabic descent, a practitioner of Islam,
a native of Logan, West Virginia, and a graduate of Marshall

---

[1]As it must, the Court construes the facts in the light most
favorable to the non-movant. See Ussery v. Manfield, 786 F.3d 332,
333 (4th Cir. 2015).

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

University. On August 24, 2009, the West Virginia University School of Pharmacy ("SOP") admitted him into its Doctors of Pharmacy Program ("Program"). The Program normally consists of eight semesters over four years with the first six consisting of "didactic" or classroom instruction, and the remaining two consisting of "experiential" rotations. Rotations are five weeks in length and administered by a "preceptor" who supervises and grades the student's performance. Preceptors may be faculty members or practicing pharmacists working at various sites throughout the state.

Al-Asbahi began to struggle early in the Program. In his first semester, Fall 2009, he received a "D" in "PHAR 702 - Physical Pharmacy," which automatically placed him on academic probation (dkt. no. 49-1 at 119-21). His probationary status meant that a second "D" would, at a minimum, "necessitate repeating all required courses with a grade lower than 'C'." Id. at 119. Finally, the terms of his probation mandated that he maintain a semester grade point average of 2.5 or higher in his elective courses, and that he receive grades of "C" or better in all of his Spring 2010 classes before the SOP would lift his probation. Id. Al-Asbahi complied with

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

the terms of his probation during the following semester, and the SOP lifted his probationary status.

In his third semester, Fall 2010, however, Al-Asbahi regressed, earning two grades of "D" and a semester grade point average of 2.07.[2] Consequently, on December 29, 2010, the SOP's Academic Professional Standards Committee ("Committee")[3] informed him that it was recommending to Dean Patricia Chase ("Dean Chase") that she dismiss him from the Program (dkt. no. 49-1 at 125). Al-Asbahi appealed the recommendation. Following a hearing on January 10, 2011, the Committee denied his appeal, reasoning that "in light of the objective academic data we feel continuation through the program at this time is not appropriate" (dkt. no. 49-1 at 138).

On January 20, 2011, Al-Asbahi submitted a letter to the Committee, together with a proposed study plan, seeking permission to apply for readmission to the Program. After reviewing his submissions, the Committee recommended to Dean Chase that she

---

[2]Al-Asbahi's grades of "D" came in "Pharmacology I - PCOL 743" and "Medical Literature Evaluation - PHAR 727."

[3]The Committee has an ongoing responsibility to determine after every semester whether each student "continues to meet a set of academic requirements, standards, and criteria for successful completion of the curriculum." Dkt. no. 49-1 at 119. In furtherance of this responsibility, it evaluates each student following every semester.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

consider Al-Asbahi for readmission in the Fall 2011 semester — but only under certain explicit conditions. By letter dated March 4, 2011, Dean Chase accepted the Committee's recommendation, but with some modifications. As an initial matter, she required that Al-Asbahi agree to enroll in and satisfactorily complete alternative course work prior to his readmission in August, 2011. If he complied, the SOP would readmit Al-Asbahi as a "P2" (second year pharmacy student), subject to the following additional conditions for the remainder of his time in the Program:

1.  He must retake all required courses beginning with the P2 year[4];
2.  He would re-enter the Program on academic probation and remain so until graduation;
3.  He must earn a grade of at least "C" for all required courses[5];
4.  He must complete all experiential rotations with satisfactory evaluations in all competencies[6]; and

---

[4]This was one of Dean Chases's significant modifications. The Committee's had recommended that Al-Asbahi be readmitted as a P1, which would have required him to retake all required courses from the beginning of the Program (dkt. no. 49-1 at 134).

[5]This was another of Dean Chases's significant modifications to the Committee's recommendations, as it had suggested that Al-Asbahi be required to receive no less than a "B" in all required courses (dkt. no. 49-1 at 134).

[6]Students normally needed a satisfactory average across all of the course's competencies in order to pass an experiential rotation. Al-Asbahi's lowest evaluation in any <u>one</u> of a course's individual competencies could not dip below the satisfactory level of "3".

5.    He must submit a comprehensive study schedule two weeks prior to each semester during the didactic portion of the Program, which the Committee would review and approve.

Dean Chase also warned Al-Asbahi that he was in "an extremely tenuous position," as this was "one final opportunity to demonstrate [he] should receive the Pharm D. degree from WVU" (dkt. no. 49-1 at 136). Al-Asbahi accepted these conditions, enrolled in and passed a pharmacology course at Duquesne University, and, on June 17, 2011, submitted his application for readmission to the Program for the Fall 2011 semester, which the SOP granted. Id. at 128-29. During the next three semesters, Fall 2011, Spring 2012, and Fall 2012, Al-Asbahi progressed in the Program without incident, earning grade point averages ("GPA") of 3.20, 3.06, and 3.13 respectively (dkt. no. 53 at 39).

Nevertheless, in the Spring 2013 semester, Al-Asbahi once again struggled. As it does following each semester, the Committee reviewed every SOP student's academic progress (dkt. no. 49-1 at 119). In reviewing his progress, it realized that Al-Asbahi received three grades of "C", making his semester GPA 2.37. Consequently, because he fell below the 2.5 minimum GPA threshold established by

---

Professors graded each student's course competencies on a scale of 1 (lowest) to 5 (highest), with a score of 3 being satisfactory.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

the terms of his readmission, the Committee recommended that Dean Chase dismiss Al-Asbahi from the Program (dkt. no. 49-1 at 155).

At the request of Dean Chase, however, the Committee spared him from dismissal. Instead, it formulated a remediation plan, which the Dean approved, that was intended to improve Al-Asbahi's chances at successfully completing the Program and passing his Board examination. Id. In addition to continuing all of the previously imposed terms of his readmission, the Committee also required that he study for and retake all the examinations for "Pharmacotherapeutics IV - PHAR 740" and "Pharmacokinetics - PHAR 741." Id. at 143. Furthermore, the SOP would inform all of the preceptors for his experiential classes that Al-Asbahi would "require close monitoring . . . while on their rotation." Id. Finally, the Committee noted Al-Asbahi's "history of marginal performance" and reminded him that his failure to pass any competency in any rotation, up to and including his final one, or his failure to receive grades of at least 70% on all of the retaken exams, would result in his dismissal from the program. Id.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

Al-Asbahi appealed the remediation plan, claiming that it set him up to fail and that he was being treated unfairly.[7] Id. at 146. Dr. Elizabeth Scharman ("Scharman"), Chair of the Committee, informed Dean Chase that the Committee was not inclined to hear his appeal and suggested instead that perhaps she should personally review his appeal, to which Dean Chase responded that Al-Asbahi should first be given a chance to meet with the Committee. Id. at 154-55. Following a hearing on July 3, 2013, the Committee denied Al-Asbahi's appeal, noting that "[i]n light of the objective academic data, we feel that decreasing the rigorousness of the remediation plan would not be appropriate." Id. at 159. Unsatisfied, he then appealed the Committee's decision to Dean Chase. Id. at 161.

On August 19, 2013, Dean Chase, together with Dr. Mary Euler ("Euler"), Associate Dean for Student Services, met with Al-Asbahi and his parents to discuss the remediation plan and the Committee's decision. Id. at 163. Once again, Dean Chase modified the Committee's recommendation in Al-Asbahi's favor, eliminating the

---

[7]One of Al-Asbahi's main complaints related to the notice that the SOP was to provide to his future preceptors indicating he would need close monitoring (dkt. no. 49-1 at 146). The Committee relayed to him the limited information preceptors would receive and informed him that it felt obligated to do such for patient safety (dkt. no. 49-1 at 151-52).

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

requirement that he retake and pass the exams for "Pharmacotherapeutics IV - PHAR 740," but leaving all the other requirements intact. Id. During his deposition, Al-Asbahi indicated that he was "pleased" with this outcome. Id. at 21.

Al-Asbahi then began what would have been his final year in the Program, which consisted solely of experiential rotations, also referred to as "Blocks."[8] The preceptor for his fourth rotation, Acute Care I, was defendant, Dr. Chadrick Lowther ("Lowther"), a non-faculty, cardiac clinical specialist at the Charleston Area Medical Center ("CAMC"). Al-Asbahi knew that Acute Care I was one of the more difficult rotations, and that Lowther in particular had a reputation for being a difficult preceptor (dkt. no. 49-1 at 25, 28). Al-Asbahi's rotation with Lowther was short-lived.

Within the rotation's first two days,[9] Lowther began to notice what he considered to be substantial deficiencies in Al-Asbahi's academic performance and knowledge base (dkt. no. 49-4 at 5).

_____

[8]There are a total of eight "Blocks" of experiential rotations, which began in the Spring 2013 semester of Al-Asbahi's third year. Normally, as of the fourth year, all of the didactic (classroom) courses are complete, and all that remains are experiential rotations.

[9]The second day is, in effect, the first day of actual experiential rotation, as the first day is generally for orientation.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

Concerned, Lowther informed his immediate supervisor at CAMC, the Director of Clinical Services, Dr. Brian Hodges ("Hodges"), who in turn told him to inform the head of the SOP's experiential learning program, Dr. Lena Maynor ("Maynor"). Id. at 6; see also dkt. no. 56 at 37 (Maynor's notes from conversation with Lowther). At Maynor's request, Lowther began to track Al-Asbahi's progress in the rotation, keeping written notes detailing his performance on a daily basis. Id.; dkt. no. 49-1 at 236-43.

On October 1, 2013, just over two weeks after Al-Asbahi had begun his rotation with Lowther, Hodges emailed Maynor to inform her that, based on his own "observation as clinical director, supervising and evaluating Mr. Al-Asbahi is taking an undue amount of time and effort, and is preventing his preceptor from the efficient conduct of his responsibilities to CAMC" (dkt. no. 49-1 at 245). Consequently, Hodges asked that the SOP "remove [Al-Asbahi] from his experience immediately, so that the preceptor may return to completing his normal duties." Id. The next day, Hodges told Al-Asbahi that he was pulling him off the rotation to avoid a failing grade. Maynor also informed Al-Asbahi by email dated October 1, 2013, and in a telephone call on October 2, that he should not

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

return to CAMC due to its request that he be removed.[10] In her
follow-up email on October 2, 2013, Maynor informed Al-Asbahi that,
based on the grading policy for experiential rotations, and contrary
to Hodges's statements, he would receive a failing grade as a result
of his removal from the rotation. Id. at 258. As a result, Dean
Chase wrote a letter to Al-Asbahi on October 7, 2013, informing him
that his failure to complete the rotation was a violation of the
terms of his remediation plan, and she therefore was dismissing him
from the Program. Id. at 253.

On October 15, 2013, Al-Asbahi submitted a written appeal of
his dismissal to WVU Vice President Dr. Fred Butcher ("Butcher")
(dkt. no. 49-1 at 255-56). His primary contention was that his
removal from the rotation was not in accord with the procedures
outlined in the West Virginia University School of Pharmacy Policy
on Academic and Professional Standards Governing the Doctor of
Pharmacy Degree Program ("Policy"). Id. Butcher agreed, finding that
the SOP dismissal had not conformed with Chapter 4 of the Policy

---

[10]Maynor also informed Al-Asbahi that, based on its contractual
agreement with the SOP, CAMC had sole discretion to remove students
from rotations at its facility (dkt. no. 49-1 at 258). Moreover,
because he was not allowed to return to CAMC, Al-Asbahi received a
grade of incomplete for the other rotation he was taking at CAMC,
"Elective Rotation 2 - PHAR 765" (dkt. no. 53 at 40).

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

governing "Procedures for Failure to Complete an Experiential Rotation."[11] Id. at 268-69. After explaining his findings, Butcher reversed Al-Asbahi's dismissal from the Program and changed his grade in Lowther's rotation from an "F" to an "I". Id. In concluding his letter, Butcher reminded Al-Asbahi that he was still subject to the remediation plan, specifically quoting from it that "failure to pass any competency in any rotation, up to and including Block 8, will result in your dismissal from the degree program." Id. at 269. Finally, the letter informed Al-Asbahi that the SOP would provide him with an academic schedule setting forth the remaining requirements for his graduation. Id.

On November 20, 2013, Dean Chase wrote to Al-Asbahi, outlining the requirements for completion of the Program. Id. at 271. In addition to reminding him of his outstanding requirement to retake

---

[11]Specifically, Butcher found that: (1) Hodges's reason for removal, that the preceptor required an "undue amount of time and effort" to supervise him, was not among those specifically enumerated in Chapter 4, § 4.2 of the Policy, nor was a facility's unilateral power to remove a student contained in the Policy; (2) Chapter 4, § 4.4 of the Policy indicates that a removed student will receive a grade of "F" or an incomplete "I", depending on the reason for the removal, however, the reasons for Al-Asbahi's removal were unclear; (3) communication between Lowther, Al-Asbahi, and Maynor regarding any deficiencies, did not conform with the policy; and (4) Lowther did not provide Al-Asbahi with written evaluations informing him of the improvement expectations.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

the exams in "Pharmacokinetics - PHAR 741," the letter made further recommendations that he not only retake the exams, but also complete the entire course, as well as recommending that he audit "Pharmacotherapeutics - PHAR 740." Id. Dean Chase also informed Al-Asbahi that all of his future preceptors would be SOP faculty members because they were "the best preceptors to teach [him] any concepts that [he had] not yet mastered." Id. This latter requirement resulted in a delay until the Summer of 2104 before he could begin his next rotation. Al-Asbahi wrote to Dean Chase to express his discontent with the faculty preceptor requirement but, following a meeting between the two on December 6, 2013, she held firm. Id. at 40, 273-74.

During the first half of the Summer 2014 semester, Al-Asbahi enrolled in "Ambulatory Care Rotation I - PHAR 762" with preceptor Dr. Jonathan Kline, receiving passing marks in all competencies (dkt. nos. 53 at 40; 49-1 at 40). Thereafter, he enrolled to retake the Ambulatory Care I rotation, this time with Dr. Jay Martello ("Martello") as his preceptor.[12] Within the first few days of the rotation, Al-Asbahi spoke with Martello to ask how he was

---

[12]Al-Asbahi had previously taken a course with Martello during his P3 year and, according to him, "it went fine." Dkt. no. 49-1 at 42.

progressing (dkt. no. 49-1 at 42). Martello informed him that he was aware of his situation, apparently referring to the notice that Al-Asbahi required close monitoring, and later indicated that, although it was too early to tell for sure, it seemed like he did have a "knowledge-based deficiency" (dkt. no. 55-2 at 112-16).

At the midpoint of the rotation, Martello completed his evaluation of Al-Asbahi (dkt. no. 49-1 at 276-80). That midpoint evaluation assigned Al-Asbahi three scores of "2 - Needs Substantial Assistance" in the competencies of "Pharmacy Knowledge," "Collecting Patient Data," and "Review Medication Orders." Id. Notably, Al-Asbahi failed to earn a single grade higher than "3 - Meets Expectations."[13] Id. Contemporaneously, Martello sent a letter to Maynor and Euler, notifying them that he was giving Al-Asbahi three scores of "2" and detailing the numerous deficiencies observed thus far in the rotation, including substantial knowledge-base deficiencies. Id. at 282-83. Martello also stated that he had met with Al-Asbahi to discuss his evaluation and concerns. Id. Martello informed Maynor and Euler that he had provided Al-Asbahi with a plan

---

[13]Even a student who was not in Al-Asbahi's situation, who had failed to earn a single score above "3" in any competency, would have been living dangerously as, even for that student, a single competency dropping to a "2" would have earned them a failing grade for the rotation.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

for improvement moving forward, and he indicated that Al-Asbahi understood and agreed. Id. Martello copied Al-Asbahi on the letter. Id. at 283, 284.

Following his receipt of Martello's letter on July 13, 2014, Al-Asbahi contended that it disclosed his deficiencies in far more detail than Martello had discussed with him, and that it added additional items beyond those previously discussed (dkt. no. 55-2 at 123-24; dkt. no. 53 at 44). The two met the following day to discuss the contents of the letter, following which Martello emailed Al-Asbahi, memorializing their conversation and indicating that, on that first day of rotation following his midpoint evaluation, he saw "good improvement" compared to the previous week (dkt. no. 55-2 at 125; dkt. no. 53 at 45). Further, he advised Al-Asbahi to "keep doing what you did today for the remainder of the rotation, being interactive, and 'going deeper' when looking up information."[14] Id.

_____

[14]Notably, Al-Asbahi latches on to this statement repeatedly to infer that, based on Martello's laudatory words the first day following his subpar evaluation, he therefore must have been in that constant state of improvement thereafter. There is no evidence that Martello felt that way. On the contrary, there is evidence in Martello's notes and final evaluation that Al-Asbahi's improvement was short-lived.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

Just two days later, however, on July 16, 2013, Al-Asbahi missed a formulary meeting. There were three midday meetings Al-Asbahi was required to attend that day, including a 12:00 "noon conference," a 12:30 "formulary conference," and a 1:30 "clinical conference" (dkt. no. 49-10 at 3). Following the rotations that morning, Al-Asbahi had asked a classmate, Eric Likar ("Likar"), where the formulary meeting was going to take place that day, and Likar inadvertently told him it was in the same room as the noon conference, 48E, which was, in fact, the wrong location (dkt. no. 55-3 at 4-5).

Al-Asbahi sat through the noon conference in room 48E, but when the subject matter changed to a topic unrelated to formulary after 12:30, he realized he was in the wrong meeting room and left. Id. at 9-10. He went to what he believed was the correct room but found the door closed. Id. at 10. Rather than attempt to enter the room, he went to Martello's office and sat outside waiting to explain his absence. Id.; dkt. no. 49-1 at 296. Shortly thereafter, Martello rushed from his office and, although he noticed Al-Asbahi, he said nothing, instead rushing off to the formulary conference (dkt. no. 55-3 at 10). Inexplicably, Al-Asbahi did not follow Martello to the conference, instead resolving himself to the fact that he had made

15

a mistake and missed the conference. Id. For reasons unknown, Al-Asbahi also failed to attend the clinical conference at 1:30 that afternoon. Id. at 16; dkt. no. 56 at 43.

Early the following morning, Al-Asbahi wrote to Martello in hopes of explaining his failure to attend the meetings, again reiterating the incorrect room number given by Likar, but not mentioning any reason for missing the 1:30 conference (dkt. no. 49-1 at 298). Martello responded by acknowledging the confusion and recognizing that "errors like this do happen," but also reminding Al-Asbahi that the schedule was posted and it was his responsibility to attend. Id. He went on, stating he doubted Al-Asbahi's claim that the door was shut when he arrived at formulary and suggesting that he either did not make it to formulary at all, or was late.[15] Id. at 299. Further, he noted that he had checked with some other individuals regarding Al-Asbahi's whereabouts, and they generally confirmed the same. Id. Al-Asbahi responded by asking Martello whether he should continue to "show up at rotation if [he] could no

---

[15]There appears to be some confusion between Martello and Al-Asbahi about the timing of the conferences. Martello states that he started formulary late, at 1:40, so he doubts that Al-Asbahi saw a shut door (dkt. no. 49-1 at 299); however, formulary started at 12:30. Either Martello mixed up the class names or he mixed up the class times.

longer successfully complete it," to which Martello did not respond. Id.

Al-Asbahi nevertheless reported for the following day's rotation, after which he asked Martello "if he needed to discuss anything with him." Id. Martello stated he had nothing to say and that they "were moving on." Id. According to Al-Asbahi, he completed the remainder of the rotation without any written or verbal indication from Martello that he was "regressing" (dkt. no. 55-3 at 20).

Following the rotation's conclusion, Martello submitted his final evaluation on Al-Asbahi (dkt. no. 49-1 at 286). Although Martello increased his ratings on the competencies of "Pharmacy Knowledge" and "Review Medication Orders" to "3", Martello still rated Al-Asbahi as "2" in "Collecting Patient Data," and additionally lowered his rating in "Professionalism" to a "2", down from a rating of "3" at the midpoint. Id. Specifically regarding the "Professionalism" competency, Martello referenced the missed meetings and the fact that he did not believe Al-Asbahi's explanation.[16]

_____

[16]Martello later provided that an additional reason for the low grade was that he perceived Al-Asbahi as too often blaming his classmate, Eric Likar, for his issues (dkt. no. 51-1 at 81-87).

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

As for the "Collecting Patient Data" competency, Martello indicated that, although Al-Asbahi had "made some improvements," "his performance in this area is still inconsistent and below what would be expected at this point in his training." Id. at 290. Specifically, Martello recalled instances "even in the second half of the rotation where Basil ha[d] not know[n] pieces of information relating to patients he was assigned to follow."[17] Id.

On August 1, 2014, immediately after receiving his final evaluation, Al-Asbahi wrote to defendant, Dr. Terrance Schwinghammer ("Schwinghammer"), Chair of the Department of Clinical Pharmacy at the SOP, requesting that, pursuant to the Policy,[18] he mediate the grade dispute. Id. at 292. Al-Asbahi's letter presented his overview of the situation, as well as his arguments as to why the ratings in the relevant competencies should be changed. Id. at 292-93. By email

---

[17]Much of Al-Asbahi's argument about his grade in Martello's rotation centers on his claim that he was not dishonest about missing the conferences. Nonetheless, assuming that he could have vindicated himself in the "Professionalism" competency and had his score changed to a "3", his dismissal still would have been justified because of his "2" in "Collecting Patient Data."

[18]Chapter 1, Section 6.2 of the Policy, "Appeal of a Grade, a Final Grade, or Exclusion from the Course," provides that, within ten working days of receiving a grade, a student may appeal it to the department Chair, who "will attempt to mediate the dispute between the student and the instructor(s) responsible for the penalty." Dkt. no. 49-1 at 70.

dated August 5, 2014, Schwinghammer agreed to meet with Al-Asbahi the following day, explained to him the mediator's role, and informed him that, if the mediation was unsuccessful, he could direct a written appeal to the Committee on Academic and Professional Integrity ("Integrity Committee") (dkt. no. 53 at 111). Approximately two hours later, Schwinghammer again emailed Al-Asbahi, informing him that he was "incorrect in stating that any further appeal would go to the [Integrity] Committee," but rather, if he was "unable to resolve the dispute, the matter [would] go immediately to Dean Chase."[19] Id.

Prior to meeting with Al-Asbahi, Schwinghammer reviewed in detail Martello's midpoint and final evaluations, as well as correspondence from Maynor and Al-Asbahi's written appeal (dkt. no. 49-1 at 303). In addition, he met with Martello, who explained his reasons for the competency scores, confirmed that they were warranted, and stated that Al-Asbahi was not being treated

_____

[19]In his deposition, Schwinghammer stated that it was Euler who directed him to bypass any Committee involvement and direct any appeal to Dean Chase (dkt. no. 51-2 at 19). Euler admitted to this directive during her deposition, testifying that she did so because the Committee did not have final decision making authority and could only present facts to the Dean (dkt. no. 51-3 at 26-27). Therefore, Euler felt that forcing Al-Asbahi to go through the process again with the Committee, rather than simply going directly to Dean Chase, would be painful and a waste of time. Id. at 27.

differently than any other student. Id. Finally, Martello told Schwinghammer that he did not intend to change any of the scores in the final evaluation (dkt. no. 55-3 at 26).

On August 6, 2014, Schwinghammer met with Al-Asbahi to hear his verbal appeal and apprise him of his meeting with Martello, ultimately informing him that, because he was only authorized to mediate the issue, he could not force Martello to change his evaluation (dkt. no. 49-1 at 303). Following the meeting, Schwinghammer wrote an email to Euler, copying Maynor and Dean Chase, in which he reviewed his discussions with Martello and Al-Asbahi. Id. Al-Asbahi also mailed a copy of all his correspondence with Schwinghammer to Dean Chase later that same afternoon. Id. at 305-07. Thus, she was fully apprised of Al-Asbahi's arguments concerning his belief that the evaluation was wrong and why she should change his grade.

By letter dated August 7, 2016, Dean Chase informed Al-Asbahi that she was dismissing him from the Program for failing to comply with the remediation plan requirements. Id. at 309. Specifically, she pointed to his failure to receive a passing level in two competencies in Martello's rotation, the same rotation he had

previously failed.[20] Finally, she informed Al-Asbahi that he could appeal her dismissal decision to the Chancellor of Health Sciences, defendant Dr. Christopher Colenda ("Colenda"), within thirty days.

On August 10, 2014, Al-Asbahi responded to Dean Chase's email, stating that "[w]ithout reading your letter, I know what it entails." Id. at 311. He reiterated his belief that his reinstatement was a farce, and that the SOP had treated him unfairly. Id. Without mentioning an appeal of either his grade or his dismissal, he told her that, "My transition to another pharmacy school as soon as possible, I believe would be in both our interests." Id.

On September 4, 2014, Al-Asbahi wrote a lengthy letter to Colenda, recounting the events to that point, outlining "all of [his] concerns," and making specific references to what he believed were Dean Chase's violations of the Policy (dkt. no. 53 at 35, 113-16). In particular, he argued that Dean Chase had dismissed him from

---

[20]This is clearly a misstatement by Dean Chase. Although he had failed as a result of his removal, that grade was overturned and replaced with a grade of "Incomplete." Of course, Lowther's criticisms of Al-Asbahi's actual deficiencies were never disputed or found to be inaccurate; rather, Butcher found that Lowther and the SOP had not followed the proper procedures or communicated sufficiently with Al-Asbahi about his deficiencies. Nonetheless, Lowther's actual criticisms and concerns have never been invalidated.

the SOP without first giving him a hearing with the Committee. Id. at 115. Based on those reasons, he stated that he was "entitled to a passing grade in his most recent rotation, and to reinstatement." Id.

He also stated that he no longer wished to re-enroll, and requested that the SOP "facilitate [his] transfer to another institution." Id. To that end, he asked that the SOP: (1) change his grade in Lowther's rotation to an "I"; (2) remove his Fall 2013 Elective Rotation from his transcript because he was prevented from attending it when he was removed from Lowther's rotation; (3) update his transcript to reflect that he passed "Pharmocokinetics - PHAR 741" in the Spring of 2014; (4) change his grade in Martello's rotation to a "P"; and (5) issue a letter of good standing to any institution to which he may transfer. Id.

Colenda, at multiple times during his deposition, indicated that he construed Al-Asbahi's letter not to be a formal appeal of his grade or dismissal, but rather, it was simply a request to alter his transcript to what he felt he deserved (dkt. no. 51-5 at 30-31, 32,34, 35-36, 37, 41). In support, he pointed to Al-Asbahi's desire not to remain at the SOP, but to move on to another school. Id. at 31, 36, 37. Because he believed this to be a technical request to

alter a transcript, Colenda referred the letter back to Dean Chase's office for direction on how to address the requests from a technical standpoint and in keeping with the regulations of the Office of the Registrar. Id. at 31-51. Dean Chase's office drafted a letter outlining proposed responses to what they also construed as requests to alter a transcript, which Colenda signed and sent to Al-Asbahi on September 30, 2014 (dkt. no. 49-2 at 28). The letter denied all five of Al-Asbahi's requests and closed by stating that Colenda's decision was final. Id.

## II. PROCEDURAL BACKGROUND

Al-Asbahi filed suit in this Court on August 24, 2015, naming as defendants the West Virginia University Board of Governors ("WVU Board") and the SOP, as well as Scharman, Schwinghammer, Martello, Chase, Maynor, Euler, Colenda, and Lowther in their individual and official capacities. His complaint asserts seven causes of action:

- Count I:        "Violation of Substantive Due Process" under 42 U.S.C. § 1983 and the Fourteenth Amendment
- Count II:       "Violation of Procedural Due Process" under 42 U.S.C. § 1983 and the Fourteenth Amendment
- Count III:      "Violation of Civil Rights, 42 U.S.C. § 1981"
- Count IV:       "Violation of Civil Rights, 42 U.S.C. § 1985(3)"
- Count V:        "Breach of Contract"
- Count VI:       "Breach of Contract"
- Count VII:      "Promissory Estoppel"

He seeks compensatory damages, punitive damages, damages for breach of contract and promissory estoppel, as well as attorney's fees and costs. Further, he seeks a declaratory judgment that the defendants violated his procedural and substantive due process rights, as well as his rights under 42 U.S.C. §§ 1981 and 1985(3). Finally, he seeks injunctive relief mandating that the SOP: (1) permit him to appeal his failing grade in Martello's Acute Care I rotation to the Committee; (2) reinstate him and change his failing grade in Lowther's 2014 Acute Care I rotation to a passing grade; and (3) immediately allow him to re-enroll, readmit him as a student in good standing, and allow him to complete his final year in the Program.

Following discovery, both parties moved for summary judgment. Al-Asbahi has moved for partial summary judgment on Counts II and V of his complaint (dkt. no. 52); the defendants collectively have sought summary judgment on all claims against them (dkt. no. 49). The motions are fully briefed and ripe for review.

### III. LEGAL STANDARD

Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" establish that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a), (c)(1)(A). When ruling on a motion for summary judgment, the Court reviews all the evidence "in the light most favorable" to the nonmoving party. Providence Square Assocs., L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir. 2000). The Court must avoid weighing the evidence or determining its truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist sufficient to prevent judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has made the necessary showing, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256 (internal quotation marks and citation omitted). The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment; the evidence must be such that a rational trier of fact could reasonably find for the nonmoving party. Id. at 248-52.

### IV. DISCUSSION

Before taking up the substantive issues raised in the parties' respective motions, the Court turns first to two preliminary issues that cut across all of the claims in the complaint.

## A.  Preliminary Issues

The parties dispute the following issues: (1) whether the SOP is an entity that is capable of being sued; and (2) whether sovereign immunity under the Eleventh Amendment removes the Court's subject matter jurisdiction to hear claims against the WVU Board or the individual defendants in their official capacities.

### 1. The SOP's Capacity to be Sued

Al-Asbahi has sued both the WVU Board and the SOP. The defendants argue that the SOP is simply a school within the University and therefore not an entity capable of being sued. Al-Asbahi attempts to refute this notion by arguing that the SOP makes decisions independently of the WVU Board and promulgates its own policy. These facts, however true, are not dispositive of the issue. West Virginia Code § 18-11-4, provides, in pertinent part, that, "[i]n consultation with the president of the university, the board of governors shall have authority to establish and maintain in the university such colleges, schools, departments and divisions as from

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

time to time may be expedient, and shall provide for the organization and management of the same." The SOP is simply a component of West Virginia University, organized and ultimately managed by the WVU Board. Id. As such, a suit against the SOP is a suit against the WVU Board, and the SOP cannot be subject to suit as a separate entity. Al-Asbahi has cited no authority to the contrary. Accordingly, the Court **DISMISSES** the SOP as a party to this action, and further notes that, even were the SOP an entity subject to suit, as is discussed below it would be immune from suit, as is the WVU Board.

### 2. Sovereign Immunity

The defendants argue that the WVU Board and the defendants Al-Asbahi has sued in their official capacity are immune from suit under the Eleventh Amendment. Al-Asbahi contends that the Fourteenth Amendment abrogates the Eleventh Amendment's protection whenever a state violates the rights conferred therein. Further, he argues that, in any event, pursuant to the doctrine of Ex Parte Young, 209 U.S. 123 (1908), the Eleventh Amendment "is no obstacle to the injunctive and declaratory relief and attorney's fees sought against the [WVU Board and SOP] in Counts I, II, III, and IV" (dkt. no. 56 at 14).

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

The Eleventh Amendment deprives federal courts of jurisdiction to hear suits against states without their explicit consent.[21] <u>See Seminole Tribe of Florida v. Florida</u>, 517 U.S. 44, 54 (1996) (dismissing case against state of Florida for lack of jurisdiction); <u>Jemsek v. Rhyne</u>, 2016 WL 5940315, at *3 (4th Cir. 2016) (noting in a § 1983 case that "[t]he Eleventh Amendment bars suits in federal court by citizens against unconsenting states and state agencies" (citing <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 100 (1984))). "This jurisdictional bar applies regardless of the nature of the relief sought." <u>Jemsek</u>, 2016 WL 5940315, at *3 (quoting <u>Pennhurst</u>, 465 U.S. at 100). Furthermore, state officials sued in their official capacities are afforded the same immunity. <u>Id.</u>

The Supreme Court of the United States, however, has held that "§ 5 of the Fourteenth Amendment allowed Congress to abrogate the immunity from suit guaranteed by [the Eleventh] Amendment." <u>Id.</u> at 59 (citing <u>Fitzpatrick v. Bitzer</u>, 427 U.S. 445, 452–56 (1976)). Importantly, the Fourteenth Amendment itself does not abrogate sovereign immunity, but rather provides Congress with the power to

---

[21]The West Virginia University and its Board are "arms and alter egos of the state," and are therefore entitled to the protections of the Eleventh Amendment. <u>See e.g.</u>, <u>West Virginia University Bd. of Governors ex rel. West Virginia University v. Rodriquez</u>, 543 F.Supp.2d 526, 535 (N.D.W.Va. 2008).

do so. Id. Even still, "Congress' intent to abrogate the States' immunity from suit must be obvious from 'a clear legislative statement.'" Id. (quoting Blatchford v. Native Village of Noatak, 501 U.S. 775, 779 (1991)). Courts have consistently held that the language of 42 U.S.C. § 1983 evinces no such intent to abrogate. See, e.g., In re Secretary of Dept. of Crime Control and Public Safety, 7 F.3d 1140, 1149 (4th Cir. 1993) ("While Congress may abrogate a State's Eleventh Amendment immunity by express statutory language, . . . it has long been settled that 42 U.S.C. § 1983 . . . does not effect such an abrogation.") (citing Quern v. Jordan, 440 U.S. 332, 342 (1979)).

Long ago, however, in Ex Parte Young, 209 U.S. 123 (1908), the Supreme Court carved out an exception to Eleventh Amendment immunity, under which "federal courts may exercise jurisdiction over claims against state officials by persons at risk of or suffering from violations by those officials of federally protected rights. This carve out is triggered, if (1) the violation for which relief is sought is an ongoing one, and (2) the relief sought is only prospective." Republic of Paraguay v. Allen, 134 F.3d 622, 627 (4th Cir. 1998) (citing Ex Parte Young); see also Jemsek, 2106 WL 5940315, at 3 (quoting Paraguay). Thus, under the doctrine

articulated in <u>Ex Parte Young</u>, "a federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law."[22] <u>Paraguay</u>, 134 F.3d at 627 (quoting <u>Quern v. Jordan</u>, 440 U.S. 332, 337 (1979)).

Applicability of the doctrine requires the Court to "conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." <u>Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.</u>, 535 U.S. 635, 645 (2002) (internal quotation omitted). Notably, the doctrine is a narrow one, specifically limited to prospective relief, but "not permit[ting] judgments against state officers declaring that they violated federal law in the past . . . ." <u>Jemsek</u>, 2016 WL 5940315, at *3 (quoting <u>P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.</u>, 506 U.S. 139, 146, (1993)).

Under the facts in this case, it is beyond argument that the WVU Board is immune under the Eleventh Amendment from all of Al-Asbahi's claims, both legal and equitable. Therefore, because it

---

[22]The Court questions, but need not decide, whether it possesses the power to order any defendant no longer an employee of the University to conform with the injunctive relief Al-Asbahi seeks.

lacks subject matter jurisdiction to hear such claims, the Court
**DISMISSES WITHOUT PREJUDICE** Counts I, II, III, and IV against the
WVU Board.[23] Further, the <u>Ex parte Young</u> exception does not apply to
the declaratory relief sought by Al-Asbahi against the defendants
he has sued in their official capacity. Thus, similarly lacking
jurisdiction to hear those claims, the Court **DISMISSES** those claims
**WITHOUT PREJUDICE.**[24]

Finally, Eleventh Amendment immunity extends to the state law
breach of contract and promissory estoppel claims pleaded by Al-
Asbahi in Counts V, VI, and VII. Recognizing the Court's lack of
subject matter jurisdiction to hear those claims, <u>see</u> <u>Pennhurst</u>,
465 U.S. at 105-06; <u>Westinghouse Elec. Corp. v. West Virginia Dept.
of Highways</u>, 845 F.2d 468, 469 (4th Cir. 1988), Al-Asbahi seeks
dismissal of those claims without prejudice (dkt. no. 32-33).

---

[23]Notably, Al-Asbahi's § 1983 claims also would fail against
the WVU Board because it is not a "person" under § 1983. <u>See</u> <u>Will
v. Mich. Dep't of State Police</u>, 491 U.S. 58, 71 (1989); <u>see also
Huang v. Board of Governors of University of North Carolina</u>, 902
F.2d 1134, 1139, n. 6 (4th Cir. 1990).

[24]Al-Asbahi does make claims for injunctive relief that,
pursuant to <u>Ex Parte Young</u>, could remain viable against the official
capacity defendants should he prevail on his claims, which are fully
discussed below.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

The defendants, however, assert that Al-Asbahi will simply re-file those claims in state court and, because sovereign immunity also bars his claims in that forum, the Court should not provide another opportunity for him to file such meritless claims at the expense of the state (dkt. no. 60 at 15). Consequently, they ask the Court to dismiss the state law claims with prejudice.

Notwithstanding defendants' argument, inasmuch as the Eleventh Amendment bars the Court from even hearing these claims, "the dismissal . . . for lack of subject matter jurisdiction must be without prejudice." <u>Patterson v. State Bureau of Investigation</u>, 92 F. App'x 38, 39 (4th Cir. 2004)(citing <u>Interstate Petroleum Corp. v. Morgan</u>, 249 F.3d 215, 219 (4th Cir. 2001) (en banc); <u>see also Barnett v. U.S. Atty. Gen.</u>, 2013 WL 1187142, at *1, n. 2 (N.D.W.Va. 2013); Fed.R.Civ.P. 41(b). Accordingly, the Court **DISMISSES WITHOUT PREJUDICE** Counts V, VI, and VII of Al-Asbahi's complaint.

**B.    Due Process Claims**

Al-Asbahi asserts two claims for violations of his due process rights. One is substantive, the other procedural. The defendants argue that Al-Asbahi has no property or liberty interest that would afford him due process protections; moreover, assuming he had such a protectable interest, they assert that they have afforded him all

MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]

the process to which he was due. Al-Asbahi on the other hand, argues that he is entitled to judgment as a matter of law on his procedural due process claim in Count II because the defendants failed to provide him legally sufficient process.

### 1. *Property or Liberty Interest*

Al-Asbahi is entitled to due process protections only if he can establish that he possessed a "liberty" or "property" interest. See Board of Curators of Univ. of Missouri v. Horowitz, 435 U.S. 78, 82 (1978). "To have a property interest subject to procedural [or substantive] due process protection, an individual must be entitled to a benefit created and defined by a source independent of the Constitution, such as state law." Huang, 902 F.2d at 1141 (citing Board of Regents v. Roth, 408 U.S. 564, 577 (1972); Bradley v. Colonial Mental Health & Retardation Servs. Bd., 856 F.2d 703, 707 (4th Cir. 1988)); see also Horowitz, 435 U.S. at 82 (noting that "property interests are creatures of state law" which must be recognized by the relevant state); Trotter v. Regents of University of New Mexico, 219 F.3d 1179, 1184 (10th Cir. 2000) (same).

Almost forty years ago, the Supreme Court of Appeals of West Virginia recognized that a student has "a sufficient property interest in the continuation and completion of his medical education

to warrant the imposition of minimal procedural due process protections." Evans v. West Virginia Bd. of Regents, 271 S.E.2d 778, 780 (W.Va. 1980) (citing State ex rel. McLendon v. Morton, W.Va., 249 S.E.2d 919 (W.Va. 1978); North v. West Virginia Board of Regents, 233 S.E.2d 411 (W.Va. 1977)). In North, the court reasoned that the plaintiff's "interest in obtaining a higher education with its concomitant economic opportunities, coupled with the obvious monetary expenditure in attaining such education, gives rise to a sufficient property interest to require procedural due process on a removal." 233 S.E.2d at 415. Of course, that same reasoning applies across any discipline, including pharmacy school. Accordingly, it is beyond debate that Al-Asbahi possessed a property interest[25] in the "continuation and completion of his [pharmacy] education" sufficient to trigger due process protections, both substantive and procedural. Evans, 271 S.E.2d at 780.

### 2. *Count I - Violation of Substantive Due Process*

In order to prevail on his substantive due process claim, Al-Asbahi must "demonstrate (1) that [he] had property or a property

---

[25]If Al-Asbahi could establish a liberty interest, that too would trigger due process protections. The law is less settled in this area, however, and, because the Court has determined that Al-Asbahi has a sufficient property interest, it need not address whether he also had a sufficient liberty interest.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

interest; (2) that the state deprived [him] of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency." MLC Automotive, LLC v. Town of Southern Pines, 532 F.3d 269, 281 (4th Cir. 2008) (quoting Sylvia Dev. Corp. v. Calvert Cty., 48 F.3d 810, 827 (4th Cir. 1995)). Because Al-Asbahi had a protectable property interest, and it is indisputable that one or more of the defendants deprived him of that right when the SOP dismissed him, the question thus is whether the decision to dismiss him was "so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency." Id.

The defendants argue that the standard sets a "high bar" and that, in order for Al-Asbahi to prevail, their actions must have "shocked the conscience" (dkt. no. 50 at 21). Al-Asbahi contends that the "shocks the conscience" standard is inappropriate here; rather, "the relevant substantive due process standard is whether Dr. Martello's evaluation reflected professional judgment and was not arbitrary and capricious" (dkt. no. 56 at 22).

Al-Asbahi expends significant effort criticizing Martello's grading decisions and evaluations in an attempt to underscore the

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

arbitrary and capricious nature of his evaluation. In this Court's view, however, Al-Asbahi's focus is misplaced. His interest in the continuation and completion of his education was deprived only when Dean Chase ultimately dismissed him from the Program. Indeed, Al-Asbahi has not pointed to, nor can the Court find, any authority establishing a protected property interest in his receiving a particular grade in Martello's rotation. See Smith v. Utah Valley Univ, 97 F.Supp.3d 998, 1004 (S.D.Ind. 2015) ("But no court has found that students have a property interest in receiving a specific grade. To the contrary, courts have been extremely skeptical when reviewing claims by students alleging that their property interest in a certain grade has been denied.") (collecting cases in support).

Martello's grading judgments are not dispositive of Al-Asbahi's claim because he has no property interest in a particular grade. Although Martello's failing grade may have set the dismissal forces in motion, Al-Asbahi's interest was deprived only by the dismissal itself. Accordingly, the proper focus of the inquiry is whether Dean Chase's dismissal sufficiently complied with the due process requirements under the totality of the circumstances in this case. See Charleston v. Bd. of Trustees of Univ. of Illinois at Chicago, 741 F.3d 769, 772 (7th Cir. 2013) (noting that courts "must

determine what process is due under the circumstances"). Finally, even if Martello's grade was a decision requiring its own due process considerations, Dean Chase reviewed Martello's evaluations and Al-Asbahi's counter contentions prior to deciding to dismiss Al-Asbahi.

The traditional standard for substantive due process violations sets a high bar. See Sylvia, 48 F.3d at 827. Moreover, protections under substantive due process are "far narrower [] than procedural; it is an absolute check on certain governmental actions notwithstanding 'the fairness of the procedures used to implement them.'" Id. (quoting Love v. Pepersack, 47 F.3d 120, 122 (4th Cir. 1995)). That is to say, the action complained of must be "so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies." Id. (quoting Rucker v. Harford County, 946 F.2d 278, 281 (4th Cir. 1991), cert. denied, 502 U.S. 1097 (1992)).[26]

_____

[26]See also Sung Park v. Indiana Univ. School of Dentistry, 692 F.3d 828, 832 (7th Cir. 2012). There, the Seventh Circuit noted the highly limited instances and rights that implicated substantive due process:

The list of such rights and interests is, however, a

MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]

When courts evaluate whether an executive action was fatally arbitrary, "a threshold question[] [is] whether the challenged conduct was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Hawkins v. Freeman, 195 F.3d 732, 738 (4th Cir. 1999); see also Bell v. Ohio State University, 351 F.3d 240, 250 (6th Cir. 2003) ("Interests protected by substantive due process . . . include those protected by specific constitutional guarantees, such as the Equal Protection Clause, freedom from government actions that 'shock the conscience,' . . . and certain interests that the Supreme Court has found so rooted in the traditions and conscience of our people as to be fundamental.").

---

short one, including things like the right to marry, the right to have children, the right to marital privacy, the right to contraception, and the right to bodily integrity. Conspicuously missing on this list is the right to follow any particular career. Indeed, no court could recognize such a right without acting in the teeth of the many cautions that the Supreme Court has given against expanding the concept of substantive due process, "because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."
Id. (quoting Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (finding that a dental student dismissed for academic and misconduct reasons did not possess a right in her continued education that implicated the substantive due process clause); see also Charleston, 741 F.3d at 774 (noting that, as to a student plaintiff's claim of a fundamental right in public higher education, "He has no such thing").

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

The undisputed facts of this case simply do not meet such a stringent standard. Property interest deprivations based on educational decisions are not of the type that are literally incapable of avoidance by any procedural protections. See Sung Park, 692 F.3d at 832. Furthermore, the decisions made by Dean Chase and other administrators, or even the grading decisions by Martello or any other professor, are not unjustified by any circumstance or governmental interest. Not only do these defendants have an interest, they owe a duty to the public to ensure that pharmacists and other medical professionals are qualified, properly trained, and of the highest caliber. See, e.g., Halpern v. Wake Forest Univ. Health Sciences, 669 F.3d 454, 464 (4th Cir. 2012) (recognizing "that the requirement that students demonstrate professional behavior is an essential aspect of [the medical school's] program"). Accordingly, Al-Asbahi has not articulated a cognizable substantive due process claim under the "shocks the conscience" standard.

The question remains whether, as Al-Asbahi contends, the standard is lower in cases of educational decisions such as the one sub judice. The answer is clearly no. In Regents of the University of Michigan v. Ewing, 474 U.S. 214, 225 (1985), a seminal substantive due process case in the context of education, the

MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]

Supreme Court of the United States found no violation of the student's rights where "the faculty's decision [to dismiss him] was made conscientiously and with careful deliberation, based on an evaluation of the entirety of Ewing's academic career."[27] <u>Ewing</u> counseled that "courts review[ing] the substance of a genuinely academic decision . . . should show great respect for the faculty's professional judgment." <u>Id.</u> This is appropriate because faculty are "uniquely positioned to observe [a student's] judgment, self-discipline, and ability to handle stress, and . . . thus especially well situated to make the necessary subjective judgment of [his] prospects for success in [his chosen] profession." <u>Id.</u> at 228, n. 14; <u>see also</u> <u>Horowitz</u>, 435 U.S. at 89-90, 92 (noting that procedural tools are not well tailored to the specialized decision making and evaluation processes of professional educators).

Courts should disturb only those academic decisions that so "substantial[ly] depart[] from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." <u>Ewing</u>, 474 U.S. at 225;

---

[27]<u>See also</u> <u>Rollins v. Board of Trustees of the University of Alabama</u>, 647 Fed.Appx. 924, 930-31 (11th Cir. 2016) (adopting <u>Ewing</u>'s reasoning); <u>Perez v. Texas A & M University at Corpus Christi</u>, 589 Fed.Appx. 244, 250 (5th Cir. 2014) (same).

see also Huang, 902 F.2d at 1142. Even evidence that the decision was "unwise or mistaken . . . cannot establish a substantive due process claim." Huang, 902 F.2d at 1142 (citing Bishop v. Wood, 426 U.S. 341, 350 (1976)).

Under the standard announced in Ewing, the determinative question here is whether the decision to dismiss Al-Asbahi was made conscientiously and with careful deliberation. 474 U.S. at 225; see also Rollins v. Board of Trustees of the University of Alabama, 647 Fed.Appx. 924, 930-31 (11th Cir. 2016) (adopting Ewing standard and referring to it as "careful and deliberate decision"). The evidence established that Dean Chase, with input from multiple other professional educators and practicing pharmacists, did not make a decision that "ventured 'beyond the pale of reasoned academic decision-making.'" Huang, 902 F.2d at 1142 (quoting Ewing, 474 U.S. at 227-28). Rather, her decision was based on data accumulated over the "entirety of [Al-Asbahi's] academic career." Ewing, 474 U.S. at 225.

Al-Asbahi received three grades of "D" in his first three semesters, leading first to probation and ultimately to the Committee's recommendation that he be dismissed from the Program. After readmission, Al-Asbahi struggled to maintain the minimal GPA

**AL-ASBAHI v. THE WVU BOARD OF GOVERNORS, ET AL.**          **1:15CV144**

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

standards established by the agreed to remediation plan, again prompting the Committee to recommend his dismissal. At that time, Dean Chase intervened and allowed him to remain in the Program. Nonetheless, he continued to struggle and was removed during his first Acute Care I rotation with Lowther. Although Vice President Butcher reversed the grade in that rotation from an "F" to an "I," he did so based on predominantly procedural issues surrounding the removal. None of Lowther's many substantive criticisms of Al-Asbahi's performance were disproved; in point of fact, they were supported in large part by the personal observations of Lowther's supervisor, Brian Hodges. This information surely informed Dean Chase's judgment. Yet again, during Al-Asbahi second Acute Care I rotation, Martello documented many of those same academic deficiencies in both his midpoint and final evaluations.

Dean Chase was involved with Al-Asbahi throughout his academic career at the SOP. She personally knew him and was familiar with struggles, many of them self-admitted; indeed, she had rejected her own Committee's recommendations for his benefit on more than one occasion. Based on the information available to Dean Chase during the entirety of Al-Asbahi's tenure at the SOP, her ultimate decision was made conscientiously and with careful deliberation based on her

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

accumulated knowledge. Therefore, even under Ewing's more permissive standard, Al-Asbahi's substantive due process claim fails. Accordingly, the Court **GRANTS** the defendants' motion for summary judgment and **DISMISSES** Count I **WITH PREJUDICE.**

### 3.   *Count II - Violation of Procedural Due Process*

To succeed on his procedural due process claim, Al-Asbahi must: (1) "that he had a constitutionally cognizable life, liberty, or property interest"; (2) "that the deprivation of that interest was caused by 'some form of state action'"; and (3) "that the procedures employed were constitutionally inadequate." Sansotta v. Town of Nags Head, 724 F.3d 533, 540 (4th Cir. 2013) (quoting Iota Xi Chapter Of Sigma Chi Fraternity v. Patterson, 566 F.3d 138, 145 (4th Cir. 2009)). Having concluded that Al-Asbahi possessed a property right to the continuation and completion of his education, which was deprived when Dean Chase dismissed him from the Program, the Court must determine whether the process afforded Al-Asbahi by the defendants was "constitutionally adequate." Id.; Goss v. Lopez, 419 U.S. 565, 577 ("Once it is determined that due process applies, the question remains what process is due.").[28]

---

[28]The parties spend a significant amount of time in their briefs parsing through the Policy and the process it provides. Such

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

The fundamental requirements of procedural due process are the right to notice and the right to be heard. Mathews v. Eldridge, 424 U.S. 319, 348 (1976). Defining procedural due process requirements, however, must remain "flexible and [it] calls for such procedural protections as the particular situation demands." Morrisey v. Brewer, 408 U.S. 471, 481 (1972). As a general principle, three factors guide what process is due in any particular situation: (1) "the degree of potential deprivation that may be created by a particular decision"; (2) "the fairness and reliability of the existing pre[deprivation] procedures, and the probable value, if any, of additional procedural safeguards"; and (3) the administrative burden and other societal costs . . . associated with

_____

an argument is irrelevant to Al-Asbahi's claims, however, because a state policy such as the one here, even assuming it is a contract, does not define the process that is due. What satisfies due process in a Fourteenth Amendment or § 1983 context is exclusively defined by the Constitution and relevant judicial precedent. See, e.g., Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 772 (2005) (Souter, J., concurring) ("[C]ontractually-guaranteed university process is not protected by the federal Constitution. Doing so would supply 'federal process as a substitute simply for state process.'"); Charleston, 741 F.3d at 773-74 ("We have rejected similar claims of an 'interest in contractually-guaranteed university process' many times, but we will be clear once more: a plaintiff does not have a federal constitutional right to state-mandated process." (internal citations omitted)). Consequently, any reliance on or reference to the process due under the Policy by the parties is wholly misplaced.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

requiring, as a matter of constitutional right, an evidentiary hearing upon demand in all cases prior to the [deprivation]." Mathews, 424 U.S. at 341-47.

Two years after it decided Mathews, in Board of Curators of Univ. of Missouri v. Horowitz, 435 U.S. 78 (1978), the Supreme Court established the standard applicable in the specific context of academic dismissals. In Horowitz, the University of Missouri Kansas City Medical School had dismissed a medical student, Charlotte Horowitz, for academic reasons during her final year of study. Id. at 80-82. At multiple times prior to her dismissal, the faculty had informed Horowitz of their dissatisfaction with her clinical progress. Id. In addition, the faculty had warned her that these problems put her continuation in the medical program at risk. Id. During the course of her years at the school, she had experienced a multitude of academic issues, including, among others, struggling through rotations, being placed on probation, and receiving unsatisfactory reviews from her instructors. Id. She had clear notice of her shortcomings from interactions with dissatisfied faculty and administrators, including, at various stages, harsh commentary on her academic abilities. Id.

MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]

Horowitz also had been periodically reviewed by the University's Council on Evaluation during her time in the program. Following her first-year struggles, the Council had recommended that the school allow her to "advance[] to her second and final year on a probationary basis." Id. at 81. Midway into her final year, the Council again met to discuss faculty dissatisfaction with her progress, including a rating of her clinical skills as "unsatisfactory" from her faculty advisor. Id. The Council recommended that Horowitz not be allowed to graduate in June and, barring "radical improvement," that the school should dismiss her from the program. Id.

The school allowed Horowitz to "take a set of oral and practical examinations as an 'appeal' of the decision not to permit her to graduate." Id. The physicians proctoring her tests were split: Two recommended she graduate on time; two recommended immediate dismissal; and three recommended continued probationary status pending further evaluations. Id. The Council ultimately reaffirmed its original recommendation, postponing her graduation and conditioning her further participation in the program on "radical improvement." Id.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

The Council met again in mid-May to determine whether Horowitz had improved sufficiently to warrant her continuation in the program past the end of that semester. After noting a "low-satisfactory" rating for a recent surgery rotation, the Council unanimously recommended that, "barring receipt of any reports that Miss Horowitz has improved radically, [she] not be allowed to re-enroll in the . . . School of Medicine." Id. at 82. The Council awaited her final rotation reports before making its recommendation official. Id.

After those reports showed no such improvement, and even included another negative report on one of the rotations, the Council unanimously reaffirmed its recommendation to dismiss Horowitz. Id. at 81-82. The University's Coordinating Committee and Dean approved the recommendation and notified Horowitz of her dismissal from the program. Id. at 82. She then submitted a written appeal to the Provost for Health Sciences, who upheld the dismissal after reviewing the record gathered during the earlier proceedings.[29]

---

[29]It bears noting that Horowitz never made a personal appearance before the Council, the Coordinating Committee, the Dean, or the Provost. She presented her contentions as to why her dismissal was improper solely in writing in her letter to the Provost.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

Of significance to the analysis of the arguments advanced by Al-Asbahi, in its analysis in Horowitz, the Supreme Court explained that, when analyzing academic decisions, courts should refrain from imposing formal procedural requirements because the academic process itself provides sufficient procedural protections. Id. at 85; see also Ezekwo v. New York City Health & Hospitals Corp., 940 F.2d 775, 785 (2d Cir. 1991) (describing the principle announced in Horowitz). It also stressed heavily that courts should give significant deference to academic decisions, reasoning that "[c]ourts are particularly ill-equipped to evaluate academic performance" because they require "an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decisionmaking." Id. at 89, 92 (emphasis added). Moreover, "[a] graduate or professional school is, after all, the best judge of its students' academic performance and their ability to master the required curriculum." Id. at 85 n. 2.[30]

---

[30]See also Manickavasagar v. Va. Commonwealth Univ. School of Medicine, 667 F.Supp.2d 635, 642–43 (E.D.Va. 2009) (noting that this is "especially" true for academic decisions in "'the health care field, [where] the conferral of a degree places the school's imprimatur upon the student as qualified to pursue his chosen profession,' a profession whose practitioners are entrusted with life and death decisions." (quoting Kaltenberger v. Ohio College of Podiatric Med., 162 F.3d 432, 437 (6th Cir. 1998)).

The Court distinguished the quantum of process due under disciplinary decisions from that due under academic decisions, "which may call for hearings in connection with the former but not the latter." Id. at 85-87. It recognized that, in its prior decision in Goss v. Lopez, 419 U.S. 565 (1975), it had held that a dismissal for disciplinary reasons required "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." Horowitz, 435 U.S. at 85. It pointed out, however, that even that due process standard did not entitle a student to a formal hearing. Id. at 86. Instead, due process in the disciplinary dismissal context requires only "an 'informal give-and-take' between the student and the administrative body dismissing him that would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context.'" Id. (quoting Goss, 419 U.S. at 584).

In contrast, when a student is dismissed for academic reasons no hearing is required — formal or otherwise. Id. at 90. The Court distinguished the "sufficient resemblance to traditional judicial

and administrative factfinding" present in disciplinary proceedings

from the less adversarial nature of academic proceedings:

> The educational process is not by nature adversary;
> instead it centers around a continuing relationship
> between faculty and students, one in which the teacher
> must occupy many roles—educator, adviser, friend, and, at
> times, parent-substitute. This is especially true as one
> advances through the varying regimes of the educational
> system, and the instruction becomes both more
> individualized and more specialized. In Goss, this Court
> concluded that the value of some form of hearing in a
> disciplinary context outweighs any resulting harm to the
> academic environment. Influencing this conclusion was
> clearly the belief that disciplinary proceedings, in
> which the teacher must decide whether to punish a student
> for disruptive or insubordinate behavior, may
> automatically bring an adversary flavor to the normal
> student-teacher relationship. The same conclusion does
> not follow in the academic context. We decline to further
> enlarge the judicial presence in the academic community
> and thereby risk deterioration of many beneficial aspects
> of the faculty-student relationship.

Id. at 88-89, 90 (internal quotation and citation omitted).[31]

The Court confirmed in Horowitz the substantial deference

afforded to academic decisions, and further "recognize[d], as did

the Massachusetts Supreme Judicial Court over 60 years ago, that a

-------

[31]The Court also noted that, prior to the Eight Circuit's
decision on appeal in Horowitz, state courts and "the Courts of
Appeals were [] unanimous in concluding that dismissals for academic
(as opposed to disciplinary) cause do not necessitate a hearing
before the school's decisionmaking body." 435 U.S. at 87.
Consequently, it was reluctant to upset such consistent precedent.
Id. at 88.

hearing may be 'useless or harmful in finding out the truth as to scholarship.'" Id. at 90 (quoting Barnard v. Inhabitants of Shelburne, 102 N.E. 1095, 1097 (Mass. 1913)). Hence, it held that no hearing is required in academic dismissal cases.

In accord with those principles, the Court then analyzed whether the school had complied with its due process requirements before dismissing Horowitz. It first found that "[t]he school [had] fully informed [Horowitz] of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment." Id. at 85. Next, it found that "[t]he ultimate decision to dismiss [Horowitz] was careful and deliberate." Id. Based on those two findings, the Court held that the process provided to Horowitz by the school had was "sufficient under the Due Process Clause of the Fourteenth Amendment." Id. Indeed, based on the totality of the facts of her case, Horowitz "[had] been awarded at least as much due process as the Fourteenth Amendment requires." Id. Significantly, the majority in Horowitz went even further, observing "that the school went beyond [constitutionally required] procedural due process." Id. (brackets in original).

Thus, Horowitz announced the boundaries of the procedural process due in academic dismissal cases. First, the student must have notice of the faculty's dissatisfaction and potential risk of his dismissal. Next, the final dismissal decision must be made carefully and deliberately. Id. at 85. Horowitz remains the standard in cases involving academic dismissals, and has been explicitly recognized by numerous courts of appeals.[32]

Applying the standard from Horowitz to the facts in the instant case, it is clear that no violation of Al-Asbahi's due process rights occurred. Prior to his ultimate dismissal, Al-Asbahi was clearly on notice not only of the dissatisfaction of the faculty and administration with his academic performance, but also of the potential risk of dismissal. He had received three grades of "D" in his first three semesters, which initially resulted in his being placed on probation and his first dismissal. Based on its dissatisfaction with his progress to that point, the Committee informed him that he could only be readmitted subject to a

---

[32]See, e.g., Rollins, 647 Fed. Appx. at 929 (11th Cir. 2015); Dean v. Univ. at Buffalo School of Medicine and Biomedical Sciences, 804 F.3d 178, 191 (2nd Cir. 2015); Hlavacek v. Boyle, 665 F.3d 823, 826 (7th Cir. 2011); Monroe v. Arkansas State Univ., 495 F.3d 591, 595 (8th Cir. 2007); Ku v. State of Tennessee, 322 F.3d 431, 436-37 (6th Cir. 2003); Brown v. Li, 308 F.3d 939, 954-55 (9th Cir. 2002); Clark v. Whiting, 607 F.2d 634, 643-44 (4th Cir. 1979).

remediation plan. In the letter Dean Chase wrote readmitting Al-Asbahi, she explicitly warned him that he was in "an extremely tenuous position," as this was "one final opportunity to demonstrate [he] should receive the Pharm D. degree from WVU" (dkt. no. 49-1 at 136).[33]

After Al-Asbahi re-enrolled, he was again admonished by the Committee when his semester GPA dropped below 2.5. This resulted in additional remediation requirements and a warning that he faced dismissal should he fail to meet them. He certainly knew of Lowther's and Hodges's dissatisfaction, which had led to his removal from his first Acute Care I rotation.[34] He also knew of the Committee's concerns when they required that his preceptors be faculty members, and that the SOP inform those preceptors that he needed close supervision. Finally, from his multiple discussions with Martello, the midpoint evaluation, and the final evaluation,

---

[33]Put in context, this "one final opportunity" came only three semesters into an eight semester program.

[34]Although Butcher's reversal of the Lowther rotation grade noted that Al-Asbahi had not received adequate <u>written</u> feedback under the Policy, he acknowledges in his deposition that Lowther was very critical of him at various times. <u>See, e.g.</u>, Dkt. no. 49-1 at 30-33. Moreover, he certainly should have been fully aware of Lowther's and Hodges's perceptions following the academic review of his rotation.

he was aware of Martello's dissatisfaction. It is beyond peradventure that Al-Asbahi was on notice of the faculty's dissatisfaction with his academic progress, and the accompanying risk of his dismissal.

It is also indisputable that Dean Chase's decision to dismiss Al-Asbahi was made carefully and deliberately. As chronicled above, Dean Chase was intimately familiar with the details of Al-Asbahi's case, having been personally involved in his history at the SOP and the several attempts to resolve his academic problems. She was involved in each of his struggles over the entirety of his time at the SOP. Indeed, to Dean Chase, Al-Asbahi was no faceless name and number on a piece of paper. She had corresponded and met with him on several occasions, and once had even met with him and his parents to discus their concerns.

Furthermore, as noted earlier, Dean Chase had evaluated Al-Asbahi's situation at various stages of his studies, including more than once rejecting her own Committee's recommendation to dismiss him. Her decisions were informed by a significant accumulation of facts, gathered from multiple professional educators, practicing pharmacists, administrators, and the Committee over the course of Al-Asbahi's entire enrollment. Martello's grade was but one piece

of the puzzle, albeit the final piece.[35] See Horowitz, 435 U.S. at 90 ("[T]he determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information." (emphasis added)); Bell v. Ohio State University, 351 F.3d 240, 252 (6th Cir. 2003) (recognizing that "academic judgments] [are] not beyond the pale of reasoned academic decision-making when viewed against the background of [the student's] entire career" (quoting Ewing, 474 U.S. at 227-28)).

Finally, both during and after his rotation, Martello informed Dean Chase of Al-Asbahi's performance and deficiencies. Not only was she able to thoroughly review Martello's evaluations, but she also had the opportunity to hear Al-Asbahi's side of the story when he sent her the detailed outline he had presented to Schwinghammer prior to the mediation. Thus, although she did not conduct a formal

---

[35]Although Martello explained his reasons for the grade he gave Al-Asbahi in "Professionalism," Al-Asbahi would have Dean Chase, and ultimately the Court, overrule Martello's evaluation and reasons for the grade in that competency. However, Martello's reasons for assigning the grade, as well as Dean Chase's affirmation, are the very kind of professional judgments that the Supreme Court has warned judges to avoid. See Ewing, 474 U.S. at 225 ("Considerations of profound importance counsel restrained judicial review of the substance of academic decisions."). Moreover, even setting all of that aside, Al-Asbahi still failed a second competency, which would have resulted in the same outcome.

MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]

appeal[36] of Martello's grade, Dean Chase was fully apprised of Al-Asbahi's arguments as to why Martello's evaluation was wrong and why she should change his grade, all before making her ultimate decision to dismiss to dismiss him from the Program. Dean Chase thus made her informed decision to dismiss Al-Asbahi with due care and deliberation.

Consequently, for the reasons discussed, the Court concludes that the defendants provided Al-Asbahi all the process he was due under the circumstances of this case, and **DISMISSES** Count II **WITH PREJUDICE.**

**C.   Counts III and IV - Violation of Civil Rights Under 42 U.S.C. §§ 1981 and 1985(3)**

Al-Asbahi's § 1981 and § 1985(3) claims also fail. Even taking the facts in the light most favorable to him, Al-Asbahi has failed to provide evidence "such that a rational trier of fact could reasonably find for [him]." See Anderson, 477 U.S. at 256. Indeed, Al-Asbahi has provided no evidence sufficient to suggest that the

---

[36]Of course, Al-Asbahi had no constitutional due process right to an appeal. See, e.g., Flaim v. Medical College of Ohio, 418 F.3d 629, 636 (6th Cir. 2005) (noting in a disciplinary expulsion case with its higher due process requirements that "due process generally does not require an appeal from a school's decision that was reached through constitutional procedures").

SOP's actions were based in whole or in part on his race, ethnicity, or national origin as required under both statutes.

In order to succeed on his § 1981 claim, Al-Asbahi must establish the following: (1) that he is a member of a racial minority; (2) that one or more of the defendants intentionally discriminated against him on the basis of his race; and, (3) that the discrimination related to one or more of the activities set forth in § 1981, such as his right to "make and enforce contracts."[37] 42 U.S.C. § 1981(a).

As to his § 1985(3) claim, Al-Asbahi "must prove: (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy." Simmons v. Poe, 47 F.3d 1370, 1376 (4th Cir. 1995). Moreover, he must establish a "'meeting of the minds' by defendants to violate [his] constitutional rights." Id. at 1377 (noting the high standard to survive summary judgment and

_____

[37]Solely for the purposes of its discussion here, the Court assumes without deciding that the Policy was a contract.

consistent rejection of § 1985 claims "in the absence of concrete supporting facts"). Accordingly, a core requirement for both claims is that the defendants must have engaged in intentional discriminatory actions based on an animus towards Al-Asbahi because of his race, ethnicity, or national origin.

Here, the entirety of Al-Asbahi's evidence of racial animus rests on two slender reeds: First, that Lowther refused his request for time off during his rotation to attend Mosque; and, second, that an email from Martello to Euler used the words "Potato Party" in the subject line. These bits of alleged circumstantial evidence hardly suffice to survive summary judgment. In the first place, Lowther's denial of Al-Asbahi's request for time off to attend Mosque did not, standing alone, interfere with his right to contract. Furthermore, even assuming that Al-Asbahi did ask for time off explicitly to attend Mosque, which Lowther vehemently denies, his allegation that Lowther's criticisms must therefore have been based on racial animus is speculative and conclusory. See Bell, 351 F.3d at 252–53 (noting that such "[m]ere conclusory and unsupported allegations, rooted in speculation," cannot survive summary judgment). Further diluting any connection is the fact that, as the Court has previously noted, Lowther did not make the decision to remove Al-Asbahi from his

rotation. Rather, it was Hodges who, based on his own observations, informed the SOP of the need to remove Al-Asbahi from the rotation.

Al-Asbahi's second piece of evidence, Martello's use of the words "Potato Party" in the subject line of an email to Euler, is even less supportive. Al-Asbahi argues that the use of such a description in the subject line is disparaging and pejorative, and justifies an inference of prejudice (dkt. no. 56 at 31). Yet, nowhere in the record does anyone present so much as a suggestion as to how such wording may be related to racial animus.[38] Consequently, this is far too slender a reed on which to support his claim.

Even absent direct evidence, Al-Asbahi could proceed with circumstantial evidence under the McDonnell Douglas burden-shifting framework. See Laing v. Fed. Exp. Corp., 703 F.3d 713, 717 (4th Cir. 2013) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). To proceed under that framework, he must make a prima facie showing that: (1) "[he] is a member of a protected class;" (2) [he] suffered an adverse action at the hands of the defendants in [his]

_____

[38]At various times during witness depositions, counsel for Al-Asbahi suggests that this may be some sort of reference to being a "couch potato," suggesting that the defendants might have thought Al-Asbahi was lazy (dkt. no. 51-3 at 16-17). Even if true, this cannot support a claim specifically premised on racial animus.

pursuit of [his] education; (3) [he] was qualified to continue in [his] pursuit of [his] education; and (4) [he] was treated differently from similarly situated students who are not members of the protected class." Bell, 351 F.3d at 253.

Based on the evidence of record, Al-Asbahi can satisfy the first two elements but not the final two, that he was qualified to continue in the Program, and that he was treated differently from similarly situated students who are not members of the protected class. Id. The record establishes that he was not qualified to continue in the SOP. Despite multiple opportunities and reprieves, he repeatedly failed to meet the necessary academic requirements. See Bell, 351 F.3d at 254 (finding that a plaintiff with a similar academic track-record could not establish § 1981 claim); see also Middlebrooks v. University of Maryland, 1999 WL 7860, at *5 (4th Cir. 1999) (affirming summary judgment where plaintiff "[did] not suggest that she had mastered the material on which she was tested; nor does she offer testimony from others to that effect").

Furthermore, even if Al-Asbahi could establish that he was qualified to continue in the Program, he has failed to establish that he was "treated differently from similarly situated students who are not members of the protected class." Bell, 351 F.3d at 253.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

He argues that no other SOP student was dismissed in his or her fourth year, with the lone exception of one student subsequently readmitted subject to a remediation program (dkt. no. 56 at 31). This, alone, however, is not a sufficiently specific comparison of "similarly situated" students. See, e.g., Amini v. City of Minneapolis, 643 F.3d 1068, 1076 (8th Cir. 2011) ("At the pretext stage, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one, requiring the plaintiff to show that he and the other candidates are similarly situated in all relevant respects.") (internal quotations omitted).

Al-Asbahi has presented no evidence that another student was situated similarly to him. That is, he has not pointed to a single example of a student who was not a member of his protected class, who had a similar multtude of academic difficulties, including a prior dismissal, continuous probation, and numerous failures to comply with a remediation plan, but who was nonetheless allowed to continue in the Program. Accordingly, having failed to present a prima facie case of discrimination, Al-Asbahi's § 1981 claim in Count III is **DISMISSED WITH PREJUDICE** .

Finally, regarding Al-Asbahi's claim of conspiracy under § 1985(3) in Count IV, the record is devoid of any evidence that the

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

defendants conspired to violate Al-Asbahi's rights. His response to the motion for summary judgment rests entirely on an email, a letter, and a phone call between Martello and Maynor. These communications, however, all concerned Al-Asbahi's performance and his grade — a subject Martello and Maynor were required to discuss as part of their employment. There simply is not even a scintilla of evidence that the two had a "meeting of the minds" to intentionally discriminate against Al-Asbahi, let alone to do so based on racial animus.[39] Consequently, inasmuch as Al-Asbahi has failed to establish evidence of a conspiracy, the Court **DISMISSES WITH PREJUDICE** his § 1985(3) claim in Count IV.

## V. CONCLUSION

For the reasons discussed, the Court:

- **GRANTS** the defendants' motion for summary judgment (dkt. no. 49);

---

[39]At various points, Al-Asbahi posits that the defendants retaliated against him because of their anger at Vice President Butcher overturning his first dismissal. Even if true, this reason, no matter how improper, would not support a § 1985(3) claim premised on racial animus. Moreover, the fact that Dean Chase continued to make decisions rejecting her own Committee's recommendations in favor of Al-Asbahi flies in the face of such a claim.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT NO. 49] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 52]**

- **DENIES** Al-Asbahi's motion for partial summary judgment (dkt. no. 52);

- **DISMISSES** Counts I, II, III, and IV of the complaint **WITHOUT PREJUDICE** as they apply to the WVU Board and the official capacity defendants, but **WITH PREJUDICE** as they apply to the individual capacity defendants; and

- **DISMISSES** Counts V, VI, and VII of the complaint **WITHOUT PREJUDICE**.

It is so **ORDERED**.

The Court **DIRECTS** the Clerk of Court to transmit copies of this Memorandum Opinion and Order to counsel of record and to enter a separate judgment order.

DATED: January 30, 2017.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE